ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
KEVIN A. SEELY (199982)
kseely@robbinsllp.com
MARIA L. MANSUR (359802)
mmansur@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ANGEL DE JESUS CEJA, Derivatively on Behalf of DEXCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEVIN R. SAYER, JEREME M. SYLVAIN, MARK G. FOLETTA, ERIC J. TOPOL, NICHOLAS AUGUSTINOS, STEVEN R. ALTMAN, RICHARD A. COLLINS, BRIDGETTE P. HELLER, KAREN DAHUT, KYLE MALADY, RIMMA DRISCOLL, BARBARA E. KAHN, and TERI L. LAWVER, <br><br> Defendants, <br><br> -and- <br><br> DEXCOM, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. **'25CV883 JES MSB** <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breaches of Fiduciary Duty, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This Complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant DexCom, Inc. ("DexCom" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in significant damages to DexCom's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.    DexCom is a medical device company based in San Diego, California.  The Company focuses on the design, development, and commercialization of continuous glucose monitoring ("CGM") systems that help individuals to manage diabetes and metabolic health through real-time data.  Due to the high cost of CGM, DexCom's customer base has relied on reimbursements through government healthcare programs such as Medicare.

3.    Prior to April 2023, Medicare and private health insurance only covered CGM systems for patients with Type 1 or Type 2 diabetes requiring insulin intensive treatment.  However, in April 2023, the Centers for Medicare and Medicaid Services ("CMS") broadened Medicare coverage for CGM systems to include Type 2 diabetes patients who rely on basal insulin to manage their blood sugar levels (the "CMS Coverage Expansion").

4.     DexCom viewed the CMS Coverage Expansion as a significant opportunity to broaden its customer base and boost revenue.  The Company's fiduciaries touted the Company's growth potential, assuring investors that the Company was well-positioned to capture the emerging Type 2 basal market. However, during this period, the public remained unaware of the significant obstacles and internal challenges that hindered the Company's growth capacity.

5.     In reality, DexCom struggled with a deficient sales force and a limited presence in primary care physician ("PCP") offices, where many of the Type 2 basal patients were treated.  Moreover, DexCom faced additional setbacks due to strained relationships with Durable Medical Equipment ("DME") distributors.  While CGM systems are primarily sold through pharmacies and DME channels, DexCom had begun shifting its focus to pharmacies before the CMS Coverage Expansion. However, in 2023, Medicare required Type 2 basal patients to fill CGM system prescriptions through DME channels, further limiting the Company's ability to expand in the market.

6.     In contrast, DexCom's largest competitor, Abbott Laboratories ("Abbott"), maintained strong relationships with DME distributors.  Abbott also offered a more competitive price point and rebate programs for its CGM systems. Unlike DexCom, Abbott had already established a strong presence with PCP offices, due to its marketing efforts and extensive range of healthcare products.  As a result, DexCom struggled to compete with Abbott and began losing market share.

7.     The public began to discover the truth concerning DexCom's overstated growth capabilities on April 25, 2024, during the Company's earnings call with analysts and investors.  During the call, DexCom's investors began to learn about the Company's challenges with sales force expansion and the need to adjust its sales force strategy.

8.     As a result, DexCom's stock price fell over 9.9%, or $13.67 per share, on April 26, 2024, to close at $124.34 per share, erasing over $5.4 billion in market capitalization in a single day.

9.     Despite the emerging truth behind DexCom's growth and business prospects, the Individual Defendants (as defined herein) continued to downplay the Company's issues and offer public assurances, helping to sustain artificially inflated stock prices.  Despite knowledge of these issues, DexCom's fiduciaries caused the Company to spend over $585 million to repurchase 7,385,662 shares of its common stock at inflated prices.  Also, due to their positions within DexCom, certain officers and directors had insider knowledge regarding its growth and business prospects. Exploiting DexCom's artificially inflated stock prices caused by the misconduct detailed herein, these individuals sold nearly $17 million worth of their personally held Company stock at inflated prices.

10.    On July 25, 2024, the truth fully emerged through DexCom's press release announcing that the Company lowered its 2024 revenue guidance by hundreds of millions of dollars.  The Company attributed its disappointing guidance to several factors, including an insufficient sales force, deteriorating relationships with DME distributors, and a decline in market share.

11.    In the wake of DexCom's disclosure, the Company's stock plunged more than 40.6%, or 43.85 per share, on July 26, 2024, to close at $64 per share compared to the previous trading day's closing of $107.85 per share, resulting in a $17.5 billion loss in market capitalization in a single day.

12.    The Individual Defendants have repeatedly issued misleading public statements concerning DexCom's growth and business prospects.  These improper statements have devastated the Company's credibility, as reflected by the Company's nearly $21.4 billion, or 45.4% total loss in market capitalization.

13.    Further, as a direct result of this unlawful course of conduct, DexCom is now the subject of a federal securities class action lawsuit filed in the U.S. District

Court for the Southern District of California on behalf of investors who purchased DexCom's shares, titled, *In re DexCom, Inc. Class Action Securities Litigation*, 3:24-cv-1485-RSH-VET (the "Securities Class Action").

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. The Court has supplemental jurisdiction over the remaining claims asserted herein under 28 U.S.C. §1367(a).

15.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) DexCom maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to DexCom, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

17.    Plaintiff Angel de Jesus Ceja was a stockholder of DexCom at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current DexCom stockholder.

**Nominal Defendant**

18.      Nominal Defendant DexCom is a Delaware corporation with principal executive offices located at 6340 Sequence Drive, San Diego, California.  DexCom is a medical device company primarily focused on the design, development and commercialization of continuous glucose monitoring systems for the management of diabetes and metabolic health by patients, caregivers, and clinicians around the world.  DexCom received approval from the U.S. Food and Drug Administration and commercialized its first product in 2006.  DexCom launched its latest generation system, the Dexcom G7, in 2023.  In August 2024, the Company launched Stelo, a biosensor designed for adults with prediabetes and Type 2 diabetes who do not use insulin.  As of December 31, 2024, DexCom had 10,300 employees around the globe.

**Defendants**

19.      Defendant Kevin R. Sayer ("Sayer") has been DexCom's Chief Executive Officer since January 2015; President since June 2011; Chairman of the Board since July 2018; and a director since November 2007.  Defendant Sayer was also DexCom's Chief Operating Officer from January 2013 to January 2015.  Defendant Sayer is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Sayer sold 100,965 shares of his personally held Company stock for $13,678,301.84 in proceeds.  DexCom paid defendant Sayer the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2024 | $1,157,254 | $14,536,111 | - | $135,432 | $15,828,797 |
| 2023 | $1,092,822 | $12,486,939 | $1,988,948 | $143,535 | $15,712,244 |

20.      Defendant Jereme M. Sylvain ("Sylvain") has been DexCom's Chief Financial Officer since March 2021 and its Chief Accounting Officer since March

2020.  Defendant Sylvain was also DexCom's Senior Vice President of Finance from March 2020 to March 2021, and Vice President of Finance and Corporate Controller from September 2018 to March 2021.  Defendant Sylvain is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Sylvain sold 7,607 shares of his personally held Company stock for $867,231.71 in proceeds. DexCom paid defendant Sylvain the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|------------------------|-------|
| 2024 | $609,323 | $5,229,163 | - | $12,626 | $5,851,112 |
| 2023 | $533,599 | $3,127,182 | $560,279 | $33,840 | $4,254,900 |

21.  Defendant Mark G. Foletta ("Foletta") has been DexCom's Lead Independent Director since November 2015 and a director since November 2014. Defendant Foletta has been the Chair and a member of DexCom's Audit Committee since at least April 2023.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Foletta sold 6,000 shares of his personally held Company stock for $702,028.84 in proceeds.  DexCom paid defendant Foletta the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|-------------|-------------|-------|
| 2024 | $388,066 | $388,066 |
| 2023 | $393,510 | $393,510 |

22.  Defendant Eric J. Topol ("Topol") has been a DexCom director since July 2009.  DexCom paid defendant Topol the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|-------------|-------------|-------|
| 2024 | $341,728 | $341,728 |
| 2023 | $346,493 | $346,493 |

23.    Defendant Nicholas Augustinos ("Augustinos") has been a DexCom director since November 2009.  Defendant Augustinos was a member of Dexcom's Audit Committee as of at least April 2023.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Augustinos sold 3,976 shares of his personally held Company stock for $489,127.52 in proceeds.  DexCom paid defendant Augustinos the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $341,728 | $341,728 |
| 2023 | $362,205 | $362,205 |

24.    Defendant Steven R. Altman ("Altman") has been a DexCom director since November 2013.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Altman sold 9,568 shares of his stock for $1,078,535.60 in proceeds.  DexCom paid defendant Altman the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $341,075 | $341,075 |
| 2023 | $343,399 | $343,399 |

25.    Defendant Richard A. Collins ("Collins") has been a DexCom director since March 2017.  Defendant Collins has been a member of DexCom's Audit Committee since at least April 2024.  DexCom paid defendant Collins the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
| --- | --- | --- |
| 2024 | $343,555 | $343,555 |
| 2023 | $345,898 | $345,898 |

26.    Defendant Bridgette P. Heller ("Heller") has been a DexCom director since September 2019.  While in possession of material, nonpublic information concerning DexCom's true business health, defendant Heller sold 1,600 shares of

her personally held Company stock for $117,486 in proceeds. DexCom paid defendant Heller the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,728 | $341,728 |
| 2023 | $346,493 | $346,493 |

27.    Defendant Karen Dahut ("Dahut") has been a DexCom director since August 2020. DexCom paid defendant Dahut the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,075 | $341,075 |
| 2023 | $345,898 | $345,898 |

28.    Defendant Kyle Malady ("Malady") has been a DexCom director since October 2020. DexCom paid defendant Malady the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $341,075 | $341,075 |
| 2023 | $343,399 | $343,399 |

29.    Defendant Rimma Driscoll ("Driscoll") has been a DexCom director since August 2023. Defendant Driscoll has been a member of DexCom's Audit Committee since at least April 2024. DexCom paid defendant Driscoll the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2024 | $343,555 | $343,555 |
| 2023 | $404,724 | $404,724 |

30.    Defendant Barbara E. Kahn ("Kahn") was a DexCom director from April 2011 to May 2024. Defendant Kahn was a member of DexCom's Audit Committee from at least April 2023 to at least April 2024. DexCom paid defendant Kahn the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2023 | $348,398 | $348,398 |

31.   Defendant Teri L. Lawver ("Lawver") has been a DexCom Consultant since January 2025.  Defendant Lawver was also DexCom's Chief Commercial Officer and Executive Vice President from January 2023 to December 2024. Defendant Lawver is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act.  DexCom paid defendant Lawver the following compensation as a director:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2024 | $607,058 | $100,000 | $5,229,163 | - | $516,606 | $6,452,827 |
| 2023 | $528,164 | $100,000 | 5,112,939 | $554,573 | $230,917 | $6,526,593 |

32.   The defendants identified in ¶¶19, 20, 31 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶19, 21-30 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21, 23, 25, 29-30 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶19-21, 23-24, 26 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶19-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

33.   Because of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe DexCom and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage DexCom in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of DexCom and not in furtherance of their personal interest or benefit.

34.    To discharge their duties, the officers and directors of DexCom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of DexCom were required to, among other things:

(a)    provide truthful and accurate information regarding DexCom's growth and business prospects;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business and to maximize the value of the Company's stock;

(c)    prioritize the interests of DexCom and its stockholders over their own personal financial interests; and

(d)    remain informed as to how DexCom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

35.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of DexCom, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make false and misleading statements and omissions of material facts that failed to disclose, *inter alia*, that: (i) DexCom's sales force was ill-equipped to carry out the Company's

expansion strategy; (ii); the Company did not maintain strong relationships with DME distributors; and (iii) as a result, the Company was losing significant market share to its competitors.

37.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of DexCom, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.   The Individual Defendants also failed to prevent the other Individual Defendants from taking such wrongful actions.   As a result, and in addition to the damage the Company has already incurred, DexCom has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

38.     In addition to these duties, under its Charter in effect since February 9, 2005, and amended through March 5, 2021, the Audit Committee Defendants, defendants Foletta, Augustinos, Collins, Driscoll, and Kahn, owed specific duties to DexCom to assist the Board in "fulfilling its statutory and fiduciary oversight responsibilities relating to the Company's financial accounting, reporting and controls."

39.     Moreover, the Audit Committee's Charter also provides the Audit Committee Defendants were specifically required to review and/or discuss, among other things, with management: (i) the quarterly results and the type and presentation of information to be included in the Company's related earnings press release prior to distribution to the public; (ii) the Company's quarterly and annual financial statements and any report or opinion by the independent auditors, prior to distribution to the public or filing with the SEC; (iii) the adequacy of the Company's accounting and financial reporting processes and systems of internal control; and (iv) the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to financial risk assessment and financial risk

management.

## **SUBSTANTIVE ALLEGATIONS**

**DexCom Overstates Its Capacity to Compete in the Type 2 Basal Market**

40.    In April 2023, after the announcement of the CMS Coverage Expansion, DexCom quickly moved to capitalize on this opportunity.  The Individual Defendants assured DexCom's investors that the Company was ready to effectively compete in the Type 2 basal market.  The Individual Defendants also emphasized that the Company had the necessary capacity for growth and was well-positioned to capture the newly expanded population.

41.    Unfortunately, DexCom investors were not made aware of the significant challenges the Company faced in capturing the Type 2 basal market.  First, DexCom's sales force was ill-equipped to effectively execute the Company's growth strategy.  The Company suffered personnel constraints and lacked presence in PCP offices, where healthcare providers treated the majority of the Type 2 basal population.

42.    DexCom also struggled to maintain strong relationships with its DME distributors.  CGMs are primarily sold through either pharmacies or DME distributors.  Several years leading up to the CMS Coverage Expansion, DexCom began transitioning from its DME distributors, gradually shifting its primary sales channel to pharmacies.  However, after the CMS Coverage Expansion in April 2023, Medicare restricted patients to fulfilling their CGM prescriptions exclusively through DME channels.

43.    In contrast, the Company's primary competitor, Abbott, had already secured a strong market position by offering a more competitive price point and building robust brand awareness among PCP offices and patients.  Abbott also maintained strong relationships with DME distributors.  As a result, DexCom faced significant disadvantages and was unable to compete on equal ground with Abbott, leading to a considerable loss of market share.

44.    Shortly after the CMS Coverage Expansion, DexCom faced deteriorating relationships with DME distributors and deficiencies with its sales force, driving a decline in market share.  Rather than alerting investors to these issues, the Individual Defendants made a series of false and misleading statements overstating DexCom's growth prospects, thereby keeping the Company's stock price at inflated levels.  As detailed below, the Insider Selling Defendants took advantage of these artificially inflated stock prices to sell nearly $17 million worth of their personally held DexCom stock.  Further, despite awareness of these ongoing issues, the Director Defendants approved the Company's repurchases of over $585 million of its own stock at inflated prices.

## IMPROPER STATEMENTS

**The Individual Defendants Misled the Public with False Assurances Concerning DexCom's Growth Prospects**

45.    Between April 27, 2023 and June 5, 2024, the Individual Defendants made a series of materially false and misleading statements concerning the Company's growth prospects and its capacity to compete in the Type 2 basal market.

46.    In particular, on April 27, 2023, the Company held an earnings call with analysts and investors to discuss its financial results for the first quarter of 2023.  During the call, defendant Sayer assured investors that DexCom was "in a great position to compete" in the Type 2 basal market.  During the call, in contrast to what the Company later revealed in its July 2024 disclosures, defendant Sayer represented that the Company maintained "very good relationships" with its DME distributors.  In particular, defendant Sayer stated: "[W]e have very good relationships with our distributors and in that channel, and we worked very hard to position them to be successful with the basal patients."

47.    On June 7, 2023, defendant Sylvain represented DexCom at the 43rd Annual William Blair Growth Stock Conference.  During the conference, in response to an analyst's question about whether the Company had the capacity to

target a significant Type 2 basal population, defendant Sylvain represented that DexCom had a sizeable sales force capable of addressing the market. In particular, defendant Sylvain stated:

> In terms of capacity, **when we doubled the size of the sales force, the focus was calling on high decile prescribers of all insulin, including basal**. And so the inroads have been made there. So from a coverage perspective, while we may want to expand coverage a little bit from the sales force, it wouldn't be a material step change in how we're going. It'd be normal as part of our thoughts around investments. **So we do have a sizable sales force**.

48.    On June 23, 2023, DexCom held an Investor Day conference call with analysts and investors. During the call, defendant Lawver reaffirmed that the Company maintained "strong relationships" with DME distributors. Additionally, defendant Lawver inflated DexCom's position in the Type 2 basal market, claiming, "[w]e're also well-positioned to extend our leadership into the type 2 basal insulin segment."

49.    During the call, despite the Company's deficient sales force and strained relationships with its DME distributors, defendant Lawver assured investors that DexCom had the right infrastructure to succeed in the Type 2 basal market. In particular, defendant Lawver stated:

> **We have the right commercial infrastructure for leading with the endocrinologists and expanding our leadership in primary care with the type 2 basal and severe hypoglycemia markets** where coverage has just opened up in the last couple of months. And when we take these covered populations together, intensive insulin therapy, basal and those with severe -- risk of severe hypoglycemia, the CGM market in the U.S. is only 20% penetrated. So we have significant runway ahead in the U.S.

50.    On September 6, 2023, DexCom presented at the Wells Fargo Healthcare Conference. During the conference, defendant Sylvain continued to represent that the Company was gaining market share in the Type 2 basal market. In particular, defendant Sylvain stated:

> And so now you've actually got a majority of the basal population, a significant majority of the basal population cover. **And where there's coverage, we've always taken share, and you see us taking share in**

*that space. **So we feel pretty good about one, taking share; two, driving adoption through the market. And again, record new patients in the second quarter, part of that as a result of some of that basal and we expect to continue to do well in that market.** And I think we talked about it, our base case is 25% adoption from sub-10%. And obviously, we're incentivized to go little faster.*

51.    On January 8, 2024, DexCom issued a press release announcing its preliminary financial results for the fiscal fourth quarter and full year ended December 31, 2023.   The press release included the Company's fiscal 2024 guidance, projecting total revenue between $4.15 billion to $4.35 billion.

52.    That same day, DexCom presented at the J.P. Morgan 42nd Annual Healthcare Conference.  During the presentation, defendant Sylvain highlighted the Company's purported growth capabilities, including in the basal market, as justification for DexCom's 2024 guidance.  In particular, defendant Sylvain stated:

You're seeing a very strong adoption in the basal population, that unmet need is significant. ***And so you continue to see outperformance in basal, but you're also seeing a really strong performance continuing in the intensive markets, both type 1 and type 2***.

\*        \*        \*

In terms of that growth, it does assume another year of record new patients. So I think ***global record new patients***. I think you can presume that there it does, when Kevin said a modest contribution from our noninsulin product, our 15-day product, we assume about 1 point of revenue associated with that. So that gives you some context around that.

And the rest is ***healthy growth really across the board in basal and the intensive population globally***. As you move down the line, you think about gross margin, if you rewind back to 2023, ***we really started 2023 with a 62% to 63% gross margin, and we're going to outpace that this year***.

\*        \*        \*

We had a really strong year in 2022, 2023 in terms of driving leverage. ***That leverage continues as we move into 2024***.

53.    On February 8, 2024, DexCom held an earnings call with analysts and investors to discuss its financial results for the fiscal fourth quarter and full year ended December 31, 2023.   During the call, defendant Sylvain reaffirmed the Company's overly optimistic 2024 guidance.   In particular, defendant Sylvain

stated:

> Turning to 2024 guidance. As we stated last month, we anticipate total revenue to be in the range of ***$4.15 billion to $4.35 billion, representing organic growth of 16% to 21% for the year***. ***This guidance assumes continued momentum in the type 2 basal-only population in the U.S.***, the expansion of Dexcom ONE on the G7 platform into new geographies, and the launch of Stelo in the summer of 2024. It also assumes the divestiture of our non-diabetes distribution business in Australia and New Zealand this quarter, which represented around $30 million of revenue in 2023.
>
> From a margin perspective, we expect full year non-GAAP gross profit margin to be in a range of 63% to 64%, operating profit margin to be approximately 20%, and adjusted EBITDA of approximately 29%. Our gross margin guidance reflects the ongoing conversion from G6 to G7 within our customer base and the associated scale that comes with that process. Below gross margin, we'll continue to be very diligent with our spend in 2024, while investing strategically behind multiple growth opportunities.

54.     On March 5, 2024, DexCom presented at the 45th Ramond James Institutional Investors Conference.   During the conference, Sean Christensen ("Christensen"), Director of Corporate Affairs and Head of Investor Relations, once again reiterated the Company's 2024 guidance, assuring investors of DexCom's growth prospects.  In particular, Christensen stated:

> ***For 2024, we expect this significant growth to continue. We've guided our top line growth for the year to 16% to 21% organic growth***. Gross margin for the year is 63% to 64%, which is relatively flat, slightly down versus 2023. ***Really, we're in the process of transitioning from our G6 hardware platform to our G7. And so as we build volumes, that will help us to scale and drive greater margin efficiency at the gross margin level***, continued operating margin expansion to about 20% and adjusted EBITDA margin of 29% forecast for this year. You see some of the assumptions there. But I think for us, this is a year in which we build on the access expansion that we had last year and continue to capitalize both within the U.S. and internationally.
>
> ***If you think about then how do we execute on this vision and the strong growth opportunity, it really starts with an excellent product, and that's what we have in G7***. With DexCom G7, we have what we believe to be new standard in CGM technology around the world. G7 is the most accurate CGM that has been cleared by the FDA and offering that standard DexCom performance that people have come to expect and trust over the years.
>
> *      *      *
>
> And DexCom CGM with G7 is also the most covered CGM in the U.S. We fought incredibly hard to ensure that our patients not only have

access to the technology, but have as low of an out-of-pocket cost as possible, given that they rely on this for managing a complex condition. And in doing so, **we've been able to really expand our coverage and lead the industry with robust coverage**. But we're not sitting still on DexCom G7. We continue to expand and innovate.

\*    \*    \*

**We also continue to make sure that we're driving the most volume to our G7 platform** so that we can get the most out of the automated lines and manufacturing scale that we've built out in our San Diego, Mesa, Arizona and Malaysia manufacturing facilities.

### Even as the Truth Begins to Emerge, the Individual Defendants Continue to Mislead the Public

55.    The truth behind DexCom's growth and business prospects began to emerge on April 25, 2024, during the Company's earnings call with analysts and investors to discuss its financial results for the first quarter ended March 31, 2024. However, before addressing the Company's negative developments, defendant Sylvain sought to cushion their impact by assuring investors about the Company's outlook.

56.    First, defendant Sylvain announced that DexCom had raised its 2024 revenue guidance range to $4.20 billion to $4.35 billion, up from its previous range of $4.15 billion to $4.35 billion.

57.    During the question-and-answer portion of the call, an analyst inquired about the Company's growth and market positioning for basal.   In response, defendant Sayer continued to provide assurances of the Company's progress in acquiring new patients and expanding market share.   In particular, defendant Sayer stated:

> **So far through the first quarter, things are growing as we expected. Record new patients, I think, helps enforce that**. And you are correct, **a good chunk of our new patients are coming through that basal channel, and we continue to see really well performance in that category**.
>
> So qualitatively, the things we talked about, the excitement in that channel, those still remain. In terms of share taking and how we look at that category, we get script data, we look at script data based on pathology. The debate -- there's no debate internally to us. **We know we're taking share and we see that data**. And I think a lot of you guys

see that data. So for what it's worth, that data is out there, you can see the scripts continuing to come our way.

For the for the purpose we talked about, when we have coverage and when we compete head-to-head, we've typically won. So I think we maybe disagree with some comments out there. But I think the data is clear. ***When you look at the script data, I think it will continue to demonstrate where this is going over time***. I hope that helps.

58.    Defendant Sylvain also continued to conceal DexCom's deteriorating relationships with DME distributors, stating, "***We still have a very strong DME business***, and certainly, the DME business continues to be supported by our partners very, very well."

59.    During the latter half of the call, defendant Sayer finally began to discuss the Company's issues with its sales force and revealed a need for adjustments to its strategy.  In particular, defendant Sayer stated:

Number one, ***we realized as we had our reps who are calling on high prescribers also calling on a number of people who weren't prescribers are doing a bunch of – going and finding new prescribers that we may not be paying enough attention to our high prescribers***. And so as we've set things up, we do have a set of folks who spend more time in the endocrinology and high-prescribing diabetologists world than with primary care.

***At the same time, we needed people to call on more primary care physicians***. Consistently, we have learned over and over again that what we call on people, we win. And so we need to call on more folks get more people out there. We've been much more aggressive with our sampling program over the past several months. We need to get samples to more individuals. We need to knock on more doors and have more relationships.

A third element of that is education. As we get to some of these offices where we have somebody who's only written 2 or 3 CGM scripts, ***we've always had certainly some account managers who are regional people use to help train patients if they don't have [ doctor ] training in the office***. We made a little more investment there.

And then last, ***there are many doctors, particularly as we get to sell and as we get more into the primary care world who may not even see a rep***. And so we do have more of an internal sales force, and again, on a regional basis to do more of that work. ***So we're trying to go broader and deeper at the same time, deeper with our high prescribers in the endocrinology world and then broader across all aspects of primary care, including training and supporting patients***.

60.    On this news, DexCom's stock price dropped over 9.9%, or $13.67 per share, on April 26, 2024, to close at $124.34 per share compared to the previous

trading day's closing of $138.01 per share, erasing over $5.4 billion in market capitalization in a single day.

61.    On June 5, 2024, during DexCom's presentation at the 44th Annual William Blair Growth Stock Conference, defendant Sylvain reiterated the Company's updated 2024 revenue guidance.  In particular, defendant Sylvain stated:

> And in terms of the full year, as of the last quarter, when we issued our earnings, we raised our guidance. And so that should give -- we obviously beat the Street expectations in the first quarter, raised guidance and continue to do well. So I think from that point of view, ***I think we're happy with where we are. We're happy with our full year guidance***. We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

62.    The statements referenced above were false and misleading when made because they failed to disclose that: (i) DexCom's sales force was ill-equipped to carry out the Company's expansion strategy; (ii) the Company did not maintain strong relationships with DME distributors; and (iii) as a result, the Company was losing significant market share to its competitors.

## THE TRUTH FULLY EMERGES

63.    On July 25, 2024, the truth fully emerged when DexCom issued a press release announcing its financial results for the second quarter of fiscal year 2024. The press release disclosed disappointing full-year guidance, falling hundreds of millions of dollars short of the Company's estimates presented to investors just three months earlier.  Specifically, DexCom had reduced its 2024 revenue guidance range from $4.20 billion to $4.35 billion to $4 billion to $4.05 billion.  In the press release, defendant Sayer remarked, "While DexCom advanced several key strategic initiatives in the second quarter, our execution did not meet our high standards."

64.    That same day, DexCom held an earnings call with analysts and investors to discuss its second quarter results and 2024 sales forecast.  During the call, defendant Sayer attributed its weakened guidance to several factors.  For example, contrary to previous statements, defendant Sayer admitted that the Company was struggling with its sales force expansion.  In particular, Sayer stated:

First, as we've worked through our U.S. sales force realignment expansion, **we have seen our share of new customers fall short of our expectations** despite still strong absolute customer additions. Second, our **U.S. revenue per customer has stepped down faster than expected** based on 2 primary drivers: rebate eligibility and channel mix.

\*      \*      \*

It was a **much more disruptive expansion** [than] we've had in the past, and that did lead to a lot of disruption, particularly at the beginning of the quarter.

65.    Additionally, defendant Sayer revealed that the Company had lost ground in the DME channel and had been struggling with its DME distributors.  In particular, defendant Sayer stated:

However, our growth in the DME channel has trailed our plan. The DME distributors remain important partners for us in our business, and **we've not executed well this quarter against these partnerships. We need to refocus on those relationships**.

\*      \*      \*

With respect to the other factors, as far as market share, we said **we've lost market share in the DME channel**.

66.    Lastly, defendant Sayer revealed the Company had also experienced a slowdown in growth in international markets.

67.    Regarding the Company's reduced guidance, defendant Sylvain added:

As mentioned earlier, the compounding effect of our slower-than-expected new customer growth in the U.S. DME channel and international business as well as increased pharmacy eligibility resulted in the need to recalibrate the guide. Our updated guidance reflects these dynamics and assumes a longer ramp in productivity in our U.S. sales force.

68.    On this news, DexCom's stock price plunged more than 40.6%, or $43.85 per share, on July 26, 2024, to close at $64 per share compared to the previous trading day's closing of $107.85 per share, erasing over $17.5 billion in market capitalization in a single day.

**DIRECTOR DEFENDANTS CAUSE DEXCOM TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES**

69.    Despite their knowledge, or reckless disregard for, the Company's growth prospects, the Director Defendants approved two substantial stock repurchases at artificially inflated prices.  While the price of DexCom's stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused DexCom to repurchase 7,385,662 shares of its own common stock for a total of $585,710,780.

70.    On February 8, 2024, DexCom filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2023, with the SEC.  According to the Form 10-K, the Company completed a stock repurchase in October 2023.  During the period, DexCom purchased 4,710,870 shares of its common stock for $399,999,971.70, at an average price of $84.91 per share.

71.    Additionally, on October 24, 2024, DexCom filed its Quarterly Report on Form 10-Q for the fiscal third quarter ended September 30, 2024, with the SEC. According to the Form 10-Q, the Company completed a stock repurchase in July 2024.  During the period, DexCom purchased 2,674,792 shares of its common stock for $185,710,808.56, at an average price of $69.43 per share.

72.    However, the Company's stock was worth only $64 per share, the trading price at market close on July 26, 2024, after the truth emerged.  In sum, DexCom overpaid over $113 million for repurchases of its own common stock at artificially inflated prices.

**INSIDER SALES BY INSIDER SELLING DEFENDANTS**

73.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of DexCom's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of DexCom, defendants Sayer,

Sylvain, Altman, Foletta, Augustinos, and Heller were privy to material, nonpublic information about the Company's true business prospects.

74.    While in possession of this knowledge, defendant Sayer sold 100,965 shares of his personally held DexCom stock for proceeds of over $13 million, just a few months before the truth emerged.  Defendant Sayer's sales were timed to maximize profit from DexCom's then artificially inflated stock price.

75.    While in possession of this knowledge, defendant Sylvain sold 7,607 shares of his personally held DexCom stock for proceeds of $867,231 of which $392,562 was sold just a few months before the truth emerged.  Defendant Sylvain's sales were timed to maximize profit from DexCom's then artificially inflated stock price.

76.    While in possession of this knowledge, defendant Altman sold 9,568 shares of his personally held DexCom stock for proceeds of over $1 million.

77.    While in possession of this knowledge, defendant Foletta sold 6,000 shares of his personally held DexCom stock for proceeds of $702,028, the month before the truth emerged.  Defendant Foletta's sales were timed to maximize profit from DexCom's then artificially inflated stock price.

78.    While in possession of this knowledge, defendant Augustinos sold 3,976 shares of his personally held DexCom stock for proceeds of $489,127.

79.    While in possession of this knowledge, defendant Heller sold 1,600 shares of her personally held DexCom stock for proceeds of $177,486 of which $113,550 was sold the month before the truth emerged.  Defendant Heller's sales were timed to maximize profit from DexCom's then artificially inflated stock price.

80.    In sum, the Insider Selling Defendants sold nearly $17 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **SAYER** Current President, Chief Executive Officer, Chairperson of the Board and a Director | 3/12/2024 | 12,470 | $131.47 | $1,639,427.16 |
| | 3/12/2024 | 14,993 | $132.43 | $1,985,570.97 |
| | 3/12/2024 | 20,930 | $133.55 | $2,795,144.99 |
| | 3/12/2024 | 2,939 | $134.07 | $394,022.62 |
| | 4/8/2024 | 27,272 | $137.96 | $3,762,488.76 |
| | 4/8/2024 | 22,361 | $138.71 | $3,101,647.35 |
| | Total: | 100,965 | | $13,678,301.84 |
| **SYLVAIN** Current Executive Vice President and Chief Financial Officer | 5/22/2023 | 2,400 | $117.58 | $282,192.00 |
| | 8/22/2023 | 1,844 | $104.38 | $192,476.72 |
| | 2/20/2024 | 3,363 | $116.73 | $392,562.99 |
| | Total: | 7,607 | | $867,231.71 |
| **ALTMAN** Current Director | 9/15/2023 | 1,000 | $101.50 | $101,495.00 |
| | 10/16/2023 | 1,000 | $77.58 | $77,580.00 |
| | 11/15/2023 | 1,000 | $101.26 | $101,256.00 |
| | 12/12/2023 | 3,000 | $120.00 | $360,004.20 |
| | 12/15/2023 | 2,000 | $122.77 | $245,548.40 |
| | 1/16/2024 | 460 | $121.97 | $56,104.41 |
| | 1/16/2024 | 1,108 | $123.24 | $136,547.59 |
| | Total: | 9,568 | | $1,078,535.60 |
| **FOLETTA** Current Lead Independent Director | 6/17/2024 | 7 | $115.18 | $806.26 |
| | 6/17/2024 | 2,212 | $117.16 | $259,159.47 |
| | 6/17/2024 | 475 | $117.77 | $55,941.56 |
| | 6/18/2024 | 3,007 | $116.75 | $351,065.15 |
| | 6/18/2024 | 299 | $117.25 | $35,056.40 |
| | Total: | 6,000 | | $702,028.84 |
| **AUGUSTINOS** Current Director | 12/15/2023 | 3,976 | $123.02 | $489,127.52 |
| | Total: | 3,976 | | $489,127.52 |
| **HELLER** Current Director | 9/12/2023 | 600 | $106.56 | $63,936.00 |
| | 6/14/2024 | 1,000 | $113.55 | $113,550.00 |
| | Total: | 1,600 | | $177,486.00 |
| | Total: | 129,716 | | $16,992,711.51 |

## DAMAGES TO DEXCOM

81.    As a result of the Individual Defendants' improprieties, DexCom disseminated improper, public statements concerning the Company's growth and business prospects.  From the time the Individual Defendants made their improper statements until the truth emerged, their actions have devastated DexCom's

credibility, resulting in a total loss in market capitalization of nearly $21.4 billion, or 45.4%.

82.    DexCom's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, DexCom's current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Investors are less likely to invest in companies that are uncertain about their own financial conditions and fail to disclose material information in a timely manner.  Additionally, DexCom's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Furthermore, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

83.    Further, as a direct and proximate result of the Individual Defendants' actions, DexCom has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from investigating and defending DexCom and certain officers and directors in the Securities Class Action for violations of federal securities laws;

(b)    excessive sums paid to repurchase DexCom common stock;

(c)    costs incurred from expended to correct the Company's inadequate internal controls over financial reporting; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to DexCom.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84.    Plaintiff brings this action derivatively in the right and for the benefit of DexCom to redress injuries suffered, and to be suffered, by DexCom as a direct result of violations of securities law, breaches of fiduciary duty, and unjust

enrichment by the Individual Defendants.  DexCom is named as a nominal defendant solely in a derivative capacity.

85.    Plaintiff will adequately and fairly represent the interests of DexCom in enforcing and prosecuting its rights.

86.    Plaintiff was a stockholder of DexCom at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current DexCom stockholder.

87.    The current Board of DexCom consists of the following eleven individuals: defendants Sayer, Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll, and non-defendant Renée Galá.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Sayer, Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll Face a Substantial Likelihood of Liability for Their Misconduct**

88.    As alleged above, defendants Sayer, Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, earnings calls, and conference presentations regarding its growth and business prospects.

89.    Additionally, defendants Sayer, Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll, caused or approved of the Company's repurchases totaling over $585 million of its stock at artificially inflated prices. Thus, defendants Sayer, Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll face a substantial likelihood of liability for their breaches of fiduciary duties and violations of securities law.

**Additional Reasons Why Demand on Defendants Foletta, Augustinos, Collins, and Driscoll Is Futile**

90.    Defendants Foletta, Augustinos, Collins, and Driscoll, as members of the Audit Committee, reviewed and approved the improper statements and earnings

guidance. The Audit Committee's Charter provides that it is responsible for overseeing the Company's financial accounting, reporting, and controls. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and growth prospects. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants Foletta, Augustinos, Collins, and Driscoll face a substantial likelihood of liability for their breaches of fiduciary duties so any demand upon them is futile.

**Additional Reasons Why Demand on Defendant Sayer Is Futile**

91. Defendant Sayer sold DexCom stock under highly suspicious circumstances. Defendant Sayer, as Chief Executive Officer and Chairman of the Board, possessed material, nonpublic DexCom information and used that information to benefit himself. Defendant Sayer sold stock based on this knowledge of material, nonpublic DexCom information regarding the Company's business prospects and the impending decrease in the value of his holdings of DexCom.

92. Any suit by the current directors of DexCom to remedy these wrongs would expose defendant Sayer's liability for violations of the federal securities laws in the pending Securities Class Action. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendant Sayer in this action, then the Company's efforts would compromise its defense of the Securities Class Action.

93. The principal professional occupation of defendant Sayer is his employment with DexCom, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.

Defendant Sayer lacks independence from defendants Foletta, Topol, Augustinos, Altman, Collins, Heller, Dahut, Malady, and Driscoll due to his interest in maintaining his executive position at DexCom. This lack of independence renders defendant Sayer incapable of impartially considering a demand to commence and vigorously prosecute this action. DexCom paid defendant Sayer the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2024 | $1,157,254 | $14,536,111 | - | $135,432 | $15,828,797 |
| 2023 | $1,092,822 | $12,486,939 | $1,988,948 | $143,535 | $15,712,244 |

Accordingly, defendant Sayer is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Sayer.

**Additional Reasons Why Demand on Defendants Foletta, Augustinos, Altman, and Heller Is Futile**

94. Defendants Foletta, Augustinos, Altman, and Heller sold DexCom stock under highly suspicious circumstances. Defendants Foletta, Augustinos, Altman, and Heller as members of the Company's Board, possessed material, nonpublic DexCom information and used that information to benefit themselves. Defendant Foletta, Augustinos, Altman, and Heller sold stock based on this knowledge of material, nonpublic DexCom information regarding the Company's business prospects and the impending decrease in the value of their holdings of DexCom. Accordingly, defendants Foletta, Augustinos, Altman, and Heller face a substantial likelihood of liability for breach of their fiduciary duty of loyalty. Any demand upon defendants Foletta, Augustinos, Altman, and Heller is futile

## COUNT I

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

95.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about DexCom, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.    Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

97.    While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to the defendants' false or misleading statements.  The Director Defendants engaged in a scheme to defraud DexCom by causing the Company to repurchase $585,710,780 in shares of its own stock at artificially inflated prices.

98.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon DexCom in connection with the Company's repurchases of its own stock during the period of wrongdoing.

99.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading

statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of DexCom stock, which were intended to, and did: (a) deceive DexCom and its stockholders regarding, among other things, the Company's growth and business prospects; (b) artificially inflate and maintain the market price of DexCom's stock; and (c) cause DexCom to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, the defendants were in possession of material, nonpublic information regarding the above.

100. The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as alleged above.

101. The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them. Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

102. The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchase of DexCom stock by the Company.

103. As a result of the Individual Defendants' misconduct, DexCom has and will suffer damages because it paid artificially inflated prices for its own common

stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

104.   DexCom would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

105.   As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with the repurchases of DexCom stock during the period of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   The Individual Defendants owed and owe DexCom fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe DexCom the highest obligation of care and loyalty.

108.   The Individual Defendants and each of them, violated and breached their fiduciary duties.

109.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding misconduct of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing DexCom was releasing materially false and misleading information to the public.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

110.   The Director Defendants, as directors of the Company, owed DexCom the highest duty of loyalty.  These defendants breached their duty of loyalty through their failure to: (i) provide truthful and accurate statements regarding the Company's

growth and business prospects; and (ii) implement and maintain adequate internal controls over financial reporting.  Accordingly, these defendants breached their duty of loyalty to the Company.

111.  The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

112.  The Insider Selling Defendants breached their duty of loyalty by selling DexCom stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold DexCom common stock.

113.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DexCom has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

114.  Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## COUNT III

**Against the Individual Defendants for Unjust Enrichment**

115.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of DexCom.  The Individual

Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to the Company.

117. The Insider Selling Defendants sold DexCom stock while in possession of material, nonpublic information that artificially inflated the price of DexCom stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

118. Plaintiff, as a stockholder and representative of DexCom, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

119. Plaintiff, on behalf of DexCom, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of DexCom, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities law, breach of fiduciary duty, and unjust enrichment;

B. Directing DexCom to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DexCom and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations;

2. a proposal to strengthen DexCom's oversight of stock repurchases;

3.     a proposal to strengthen the Company's controls over financial reporting;

4.     a provision to control insider selling and claw back profits in the event improper insider selling is discovered;

5.     a proposal to strengthen DexCom's oversight of its disclosure procedures;

6.     a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

7.     a provision to permit the stockholders of DexCom to nominate at least three candidates for election to the Board;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of DexCom has an effective remedy;

D.     Awarding to DexCom restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

1

## <u>JURY DEMAND</u>

2   Plaintiff demands a trial by jury.

3 Dated: April 14, 2025    ROBBINS LLP
              BRIAN J. ROBBINS
4               KEVIN A. SEELY
               MARIA L. MANSUR

5

6              */s/Brian J. Robbins*
               BRIAN J. ROBBINS

7

8              5060 Shoreham Place, Suite 300
               San Diego, CA 92122

9              Telephone: (619) 525-3990
               Facsimile (619) 525-3991

10             E-mail: brobbins@robbinsllp.com
                kseely@robbinsllp.com

11                mmansur@robbinsllp.com

12             Attorneys for Plaintiff

13

1688087

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>VERIFICATION</u>

I, Angel de Jesus Ceja, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____4/10/2025_____

Signed by:

*Angel de Jesus Ceja*
71D9694CA4C64BF ANGEL DE JESUS CEJA